In the Matter of:

# JOSEPH STRONG

**v**

## POLICE OFFICER JOSEPH PERRONE

### JOSEPH PERRONE

*July 19, 2018*





ALLIANCE
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
120 East Avenue, Suite 200 • Rochester, NY 14604

585.546.4920  ▪  www.alliancecourtreporting.net  ▪  800.724.0836

Confidential

1                    CONFIDENTIAL SECTION INCLUDED

2                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - - - - - - - - - -
     JOSEPH STRONG,
4
             Plaintiff,
5
                           Case No. 17-cv-6183
6    v.

7    POLICE OFFICER JOSEPH PERRONE,

8            Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - -
9

10   Deposition Upon Oral Examination of:

11           Joseph Perrone

12

13   Location:       City of Rochester
                     Department of Law
14                   City Hall
                     30 Church Street, Room 400A
15                   Rochester, New York 14614-1224

16

17   Date:           July 19, 2018

18

19   Time:           2:01 p.m.

20

21

22   Reported By:    MICHELLE MUNDT ROCHA

23                   Alliance Court Reporting, Inc.

24                   120 East Avenue, Suite 200

25                   Rochester, New York 14604

**ALLIANCE**
COURT REPORTING, INC.

*Video Conferencing and Videography Center*

585.546.4920    ▪    www.alliancecourtreporting.net    ▪    800.724.0836

Confidential

2

```
 1                    A P P E A R A N C E S
 2    Appearing on Behalf of Plaintiff:
 3    Matthew Albert, Esq.
 4       The Law Offices of Matthew Albert, Esq.
 5       254 Richmond Avenue
 6       Buffalo, New York 14222
 7       mattalbertlaw@gmail.com
 8
 9    Appearing on Behalf of Defendant:
10    Patrick Beath, Esq.
11       City of Rochester
12       Department of Law
13       City Hall
14       30 Church Street, Room 400A
15       Rochester, New York 14614-1224
16       Patrick.Beath@cityofrochester.gov
17
18                    *         *         *
19
20
21
22
23
24
25
```



Confidential

3

S T I P U L A T I O N S

1

THURSDAY, JULY 19, 2018;

2

(Proceedings in the above-titled matter

3

commencing at 2:01 p.m.)

4

\*        \*        \*

5

IT IS HEREBY STIPULATED by and between the

6

attorneys for the respective parties that this

7

deposition may be taken by the Plaintiff at this time

8

pursuant to notice;

9

IT IS FURTHER STIPULATED, that all

10

objections except as to the form of the questions and

11

responsiveness of the answers, be reserved until the

12

time of the trial;

13

IT IS FURTHER STIPULATED, that pursuant to

14

Federal Rules of Civil Procedure 30(e)(1) the witness

15

requests to review the transcript and make any

16

corrections to same before any Notary Public;

17

IT IS FURTHER STIPULATED, that if the

18

original deposition has not been duly signed by the

19

witness and returned to the attorney taking the

20

deposition by the time of trial or any hearing in this

21

cause, a certified transcript of the deposition may be

22

used as though it were the original;

23

IT IS FURTHER STIPULATED, that the

24

attorneys for the parties are individually responsible

25

Confidential

4

```
 1              JOSEPH PERRONE - BY MR. ALBERT
 2    for their certified transcript charge, including any
 3    expedite or other related production charges in
 4    accordance with Rochester Rules;
 5              AND IT IS FURTHER STIPULATED, that the
 6    Notary Public, MICHELLE MUNDT ROCHA, may administer
 7    the oath to the witness.
 8                   *       *       *
 9    JOSEPH PERRONE,
10              called herein as a witness, first being sworn,
11              testified as follows:
12              EXAMINATION BY MR. ALBERT:
13              Q.  Good afternoon, Officer Perrone.
14              A.  Good afternoon.
15              Q.  Officer, my name is Matt Albert.  I
16    represent Joseph Strong in a civil suit against at
17    this point just you relating to an incident that
18    happened back in January of 2015.
19              Have you done depositions before?
20              A.  Never.
21              Q.  Okay.  You've testified in courtrooms
22    before?
23              A.  Yes, I have.
24              Q.  So it's the same principles.  Basically in
25    regular conversation we might overlap, that's how it
```

Confidential

5

1           JOSEPH PERRONE - BY MR. ALBERT

2    goes.  You might know what I'm going to ask you, so

3    you answer before I'm done with the sentence.  But as

4    you know, with a court reporter, we have to make her

5    happy and wait.  Only one person can talk at a time is

6    what I'm trying to say.

7           A.  Okay.

8           Q.  And obviously if I ask you something that

9    you're unclear about, let me know, and I'll try again.

10   Fair enough?

11          A.  Fair enough.

12          Q.  Okay.  Officer, let's start with how long

13   have you been employed with the City of Rochester

14   Police Department?

15          A.  12 years now, currently assigned as a

16   sergeant.

17          Q.  Okay, you're a sergeant now.  Back in '15

18   what was your rank at that time?

19          A.  Officer.

20          Q.  And what's your level of education?

21          A.  I have some college, no degree.

22          Q.  And back in '15 you were patrol; is that

23   correct?

24          A.  Yes.

25          Q.  Is that what you were from when you



ALLIANCE
COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920        ■        www.alliancecourtreporting.net        ■        800.724.0836

Confidential

6

1                JOSEPH PERRONE - BY MR. ALBERT

2    started your career at the police department?

3           A.   Yes.

4           Q.   And let me ask you this question:

5    Obviously your main duties as patrol is to respond to

6    911 calls; correct?

7           A.   Correct.

8           Q.   Are those calls recorded in any way, shape

9    or form?

10          A.   The actual phone call?

11          Q.   Right.

12          A.   Yes, I believe through 911 they are.

13          Q.   That's what I thought.  What agency is

14   responsible for recording the 911 calls, if you know?

15          A.   To my knowledge, it would be the Monroe

16   County emergency communications department.

17          Q.   Do you know how long each call is

18   preserved for?

19          A.   I do not.

20          Q.   Monroe County emergency -- sorry.

21          A.   Monroe County emergency communications

22   department.

23          Q.   Communications department?

24          A.   Yes.

25          Q.   And as a patrol officer, when a 911 call



Confidential

7

1              JOSEPH PERRONE - BY MR. ALBERT

2    comes in, do you hear the contents of the phone call?

3         A.   No.

4         Q.   So how is that 911 call transmitted to

5    you?

6         A.   I don't work in that capacity of

7    communications.  But to my knowledge, it goes through

8    a telecommunicator, who receives the phone call from

9    the individual calling 911; and that information is

10   then transmitted to a dispatcher, who enters it onto

11   the computer as well as dispatches it over the air as

12   well as on the computer.

13        Q.   So when you're responding to a call,

14   that's based upon both radio transmissions as well as

15   computer data; correct?

16        A.   Correct.

17        Q.   All right.  And we're going to get to the

18   call in question on January 16, 2015, in a second.

19   First some more background questions.

20             Prior to this date, had you ever shot a

21   dog previously in your career as a Rochester Police

22   Officer?

23        A.   Yes.

24        Q.   How many?

25        A.   Before that date, I believe it was two

Confidential

8

```
 1              JOSEPH PERRONE - BY MR. ALBERT
 2   occasions.
 3         Q.   So you've shot three dogs in your career;
 4   correct?  Or have you shot any after that date?
 5         A.   There was one after that, I believe.
 6         Q.   So you've shot four dogs in your career;
 7   correct?
 8         A.   Yes.
 9         Q.   Do you know whether anyone else in your
10   department has shot that many dogs?
11         A.   I don't.
12              MR. BEATH:  Objection.
13              If you know.
14         Q.   You don't know if there is; right?
15         A.   I don't know.
16         Q.   So you don't know of anyone who has shot
17   four or more dogs that's employed by the Rochester
18   Police Department?
19              MR. BEATH:  Objection.
20              You can answer.
21         A.   I don't know.
22         Q.   And have you ever shot any dogs while you
23   were off duty at any time in your life?
24         A.   No.
25         Q.   Just when you're on duty; correct?
```



Confidential

9

1     JOSEPH PERRONE - BY MR. ALBERT

2   A. Correct.

3     MR. BEATH:  Objection.

4     You can answer.

5     MR. ALBERT:  What's the basis for that

6 one?

7     MR. BEATH:  He's already testified that he

8 shot dogs while he was on duty.  That's his answer.

9   Q. Do you know whether any of those dogs

10 survived being shot by you?

11   A. Yes, I do.

12   Q. And have they?

13   A. Yes.

14   Q. Which ones?

15   A. There was a German Shepherd that was shot

16 by me, and it was shot in the leg, and it survived.

17   Q. What about the other three, how did they

18 make out?

19   A. One other lived as well; and the other one

20 I don't know, because it was cared for by the owner,

21 and I don't know the outcome.

22   Q. Do you know the breed of the other dog

23 that you said survived?

24   A. I believe it was a pit bull mix kind of.

25   Q. Do you know the approximate dates of these



ALLIANCE
COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920  ■  www.alliancecourtreporting.net  ■  800.724.0836

1              JOSEPH PERRONE - BY MR. ALBERT

2    shootings?

3         A.   The first one was probably in 2008.   The

4    second one maybe 2011, '10, somewhere around there.

5    And then the other two were in '15.

6         Q.   This incident in January and then a

7    subsequent one; correct?

8         A.   Yes.

9              MR. ALBERT:   And I'll follow this up in

10   writing; but for the record, I'd just make a continued

11   request to produce any and all documentation,

12   including discharge firearm forms relating to these

13   four instances.

14             MR. BEATH:   You can put it in writing.

15   We'll take it under advisement.

16        (Document request -- Documents relating to four

17        dog shootings)

18        Q.   Have you ever faced any disciplinary

19   action while employed by the Rochester Police

20   Department?

21             MR. BEATH:   Objection.   I'm going to

22   instruct the officer not to answer except insofar as

23   to similar incidents.   So if you want to ask him about

24   discipline concerning other dog shootings --

25             MR. ALBERT:   Well, I think he has to



1              JOSEPH PERRONE - BY MR. ALBERT

2    answer; whether it's admissible or not is a separate

3    question in its entirety.  But for the purpose of

4    depositions, anything is admissible that can lead to

5    potentially admissible evidence.

6              MR. BEATH:  These records are protected

7    under the Civil Rights Rule 50A.

8              MR. ALBERT:  I know that.

9              MR. BEATH:  So I'm not going to let him

10   answer.  I'm happy if you want to call the court and

11   get a ruling, but he can answer insofar as it pertains

12   to discipline resulting from other dog shootings.

13             MR. ALBERT:  I mean, I don't want to stop

14   the depos.

15             MR. BEATH:  We can mark it for a ruling if

16   you'd prefer to do that.

17             MR. ALBERT:  Sure.  That's fine.  Meaning?

18             MR. BEATH:  Meaning we'll put something in

19   the transcript indicating that we had a dispute; and

20   then if you want to make a motion later, we'll make a

21   motion.

22             MR. ALBERT:  That's fine.

23        Q.  Relating to the four shootings that you've

24   referenced, have you ever faced any disciplinary

25   action relating to any or all of those shootings?

Confidential

12

1              JOSEPH PERRONE - BY MR. ALBERT

2          A.  No.

3          Q.  Has anyone filed an internal affairs or

4   grievance complaint against you, as far as you know,

5   for any of these four shootings?

6          A.  No.

7          Q.  Have you ever shot any people during your

8   career as a police officer?

9              MR. BEATH:  Objection.  I am not going to

10  let him answer the question.

11             MR. ALBERT:  He has to answer that.  It's

12  work history.

13             MR. BEATH:  He's not going to answer the

14  question.

15             MR. ALBERT:  Okay.  Let's get the judge on

16  the phone, please.

17         (The proceeding recessed at 2:09 p.m.)

18         (The proceeding reconvened at 2:26 p.m.;

19         appearances as before noted.)

20  JOSEPH PERRONE, resumes;

21         CONTINUING EXAMINATION BY MR. ALBERT:

22         Q.  Officer Perrone, do you have any dogs

23  yourself?

24         A.  I do.

25         Q.  Yeah?  What breeds?



Confidential

13

1          JOSEPH PERRONE – BY MR. ALBERT

2          A.   I have a pit bull.

3          Q.   Okay.  And how long have you had that dog

4      for?

5          A.   Five years.

6          Q.   I'm going to go directly at this point to

7      the date in question, January 16, 2015.  You were

8      working on that date; correct?

9          A.   Correct.

10         Q.   And what was your shift that day, do you

11     know?

12         A.   7 a.m. to 3 p.m.

13         Q.   And had you been working a double the

14     night before, or did you start at 7?

15         A.   I started at 7.

16         Q.   And did you receive a dispatch at or

17     around 11:15 directing you to Trafalgar Street?

18         A.   Yes, I did.

19         Q.   Do you recall what the nature of that

20     dispatch was?

21         A.   It's my recollection it was for a neighbor

22     calling in that there was an open door across the

23     street from them, and they thought that there might be

24     a burglary occurring at that home.

25              MR. ALBERT:  Okay.



Confidential

14

1           JOSEPH PERRONE - BY MR. ALBERT

2           (There was a discussion off the record.)

3           (The proceeding recessed at 2:29 p.m.)

4           (The proceeding reconvened at 2:32 p.m.;

5           appearances as before noted.)

6           (The following exhibit was marked for

7           identification:  EXH Number 4.)

8  JOSEPH PERRONE, resumes;

9           CONTINUING EXAMINATION BY MR. ALBERT:

10          Q.  So it looks like Deposition Exhibit 4 --

11  and if you would turn to the second page -- well,

12  first of all, do you recognize what this document is?

13          A.  Yes, I do.

14          Q.  What is it?

15          A.  This appears to be a printout copy of what

16  would be entered in on the computer in one's police

17  car.

18          Q.  Okay.  So upon arriving -- strike that.

19          Before arriving, was there anything else

20  that you saw or anything else that you heard aside

21  from what popped up on your computer, this document?

22          A.  I can't recall.

23          Q.  And it looks like, following the lines,

24  its initial priority is a 1.  What does that mean, 1P?

25          A.  That's something the emergency



Confidential

15

1          JOSEPH PERRONE - BY MR. ALBERT

2    communications department puts in.  I do not know.

3          Q.  So you don't know what that means as to

4    whether it's a high priority call, low priority call

5    or anything else?

6          A.  If I would make an assumption, it would be

7    what's called a priority 1 call.

8          Q.  Okay.  What is a priority 1?  Does that

9    mean it's top priority or lowest priority?

10         A.  Yes, top priority.

11         Q.  And does it indicate anywhere in the text

12   that the 911 caller indicated a burglary was taking

13   place?

14         A.  They don't use the word "burglary," no.

15         Q.  They say that a door's open; correct?

16         A.  Correct.

17         Q.  Do you remember what the weather was like

18   on the date and time in question?

19         A.  Cold and snow.

20         Q.  Aside from that, do you remember the wind

21   levels on that date?

22         A.  No.

23         Q.  You don't know whether it was real windy

24   or not?

25         A.  I don't.



Confidential

16

1          JOSEPH PERRONE - BY MR. ALBERT

2          Q.   And were you riding in a one-car unit on

3    that date?

4          A.   Yes, I was.

5          Q.   And who was the first individual that

6    responded to that location, 123 Trafalgar Street?

7          A.   Myself.

8          Q.   And what did you do upon arrival?

9          A.   I took an overview of the outside of the

10   house upon pulling up in front kind of close to the

11   location.  To my recollection, I observed a front door

12   that was open; and I exited my police car and began to

13   walk towards the stairs.

14          (The following exhibit was marked for

15          identification:  EXH Number 5.)

16          Q.   Upon your walking towards the stairs, were

17   there any officers present at the scene at that point?

18          A.   No.

19          Q.   What happened next?

20          A.   I observed the front door open.  I made my

21   way into the vestibule area inside, where I was met by

22   a closed door, I believe, right in front of me.  And

23   as I turned to my left, there was an open door that

24   appeared to lead to an apartment immediately to my

25   left.

Confidential

1        JOSEPH PERRONE - BY MR. ALBERT

2          Q.  Okay.  So there's only so much we can do

3    with this photograph.  But showing you depo Exhibit 5,

4    does this reflect the front area of 123 Trafalgar

5    Street?

6          A.  I believe so.

7          Q.  Take a moment to look at it.

8          A.  Yes, it's 123 Trafalgar Street.

9          Q.  And you're stating that there were two

10   doors to the -- there were -- there's an exterior door

11   and an interior door that one would have to access to

12   get into the first room in the front; correct?

13         A.  Yes.  This front door here (indicating), I

14   believe, was open.  And then if you walk straight

15   through that open door, you're going to be met by a

16   closed door straight ahead.

17         Q.  So there was a closed door straight ahead,

18   okay.  And that second door cuts off access to the

19   front unit; correct?

20         A.  I'm not sure where that front door led.

21         Q.  Okay.  So you set foot in the residence;

22   is that correct?

23         A.  Into the vestibule area there, yes.

24         Q.  What happened next?

25         A.  I observed an open door to my left, which



1                JOSEPH PERRONE - BY MR. ALBERT
2    would be just past this first door (indicating).
3    There's an open door on the left that looks to go to
4    lead to an apartment there.
5                Q.   Then what happened?
6                A.   I heard -- I took, you know, observations
7    of that.  I heard what I believed to be a television
8    on at the time.  Wondering what was going on, I made a
9    verbal announcement of, "Rochester Police Department.
10   If anyone's inside, make yourself known."
11               Q.   And, now, at any point did you -- you
12   walked into the vestibule area without knocking;
13   correct?
14               A.   Yeah, the door was open.  Yes.
15               Q.   Okay.  Why did you announce your presence
16   inside the house as opposed to outside the residence?
17               A.   I made my announcement where the open door
18   was into the apartment.
19               Q.   But the question was why did you -- did
20   you try -- when you were outside the house, did you
21   try to make any contact with anyone who was inside the
22   house?
23               A.   No.
24               Q.   Why not?
25               A.   I didn't think that was reasonable at the



1            JOSEPH PERRONE - BY MR. ALBERT
2   time.
3            Q.   Why?
4            A.   Because I didn't notice the other door to
5   the left was open.  I wouldn't know that until I went
6   into the vestibule area.  I made my announcement
7   because of the open door into the apartment, not the
8   open door to the front.
9            Q.   Was your gun drawn at any point?
10           A.   When I noticed the open door to the left
11  that led to an actual apartment, I believed there to
12  be a possible burglary in progress.  So my gun was
13  drawn at that point.
14           Q.   But your gun was not drawn as you walked
15  up to the porch; correct?
16           A.   Correct.
17           Q.   Now, you walked up the steps, you pull
18  open the door -- the exterior door; right?
19           A.   No.
20           Q.   I'm sorry.  The exterior door was open.
21  So you walked in, and then you walked up to the left;
22  is that correct?
23           A.   No.  Just immediately upon entering this
24  open front door, there's a vestibule area in there.
25  As soon as you enter, all I had to do was look to my

Confidential

20

1              JOSEPH PERRONE - BY MR. ALBERT
2     left, and there was a door there that was open.  So I
3     stopped at that point.
4              Q.   Okay.  So you -- okay.  Understood.  You
5     go through the open exterior door; right?
6              A.   (The witness indicated nonverbally.)
7              Q.   Then you look off to your left; correct?
8              A.   Correct.
9              Q.   You see the open door to your left;
10    correct?
11             A.   Correct.
12             Q.   Then you announce your presence; correct?
13             A.   Correct.
14             Q.   How long did all that take, roughly?
15             A.   Roughly maybe a minute.
16             Q.   So you were in the residence for about a
17    minute before you announced your presence; is that
18    accurate?
19             A.   In the vestibule area?
20             Q.   Yes.
21             A.   I mean, within a minute is I'm in the
22    vestibule area noticing the open door and announcing
23    my presence.
24             Q.   So within a minute.  But was it within ten
25    seconds or closer to a minute?



ALLIANCE
COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920        ▪        www.alliancecourtreporting.net        ▪        800.724.0836

Confidential

```
1              JOSEPH PERRONE - BY MR. ALBERT
2        A.   Within a minute.
3        Q.   So you don't know -- you can't give us a
4   better time estimate than within a minute?
5        A.   I can give you within a minute.
6        Q.   Okay.  Then what happened?
7        A.   I make my announcement.  Immediately upon
8   finishing my announcement I'm met with a dog that is
9   charging towards me from that apartment.
10       Q.   Where was the dog coming from?
11       A.   The apartment to the left with the open
12  door.
13       Q.   Did the dog -- when you say the dog was
14  charging, describe what you mean by that.
15       A.   Traveling quickly.
16       Q.   Traveling quickly, okay.  And aside from
17  the dog moving at, I guess, a quick rate of speed,
18  what else was the dog doing, if anything, that you
19  recall?
20       A.   The dog showed its teeth, was low to the
21  ground and was not making any sound.
22       Q.   So when you say the dog was low to the
23  ground, if you could maybe elaborate what you mean by
24  that, please.
25       A.   Low to the ground, traveling quickly.
```

Confidential

22

1          JOSEPH PERRONE - BY MR. ALBERT

2   Just like it had a mission on where it was going.

3          Q.   Okay.  As you turn to your left, make the

4   announcement, where are you in relation to that open

5   door that the dog came out of?

6          A.   Inside the vestibule, just outside of the

7   open door to the apartment.

8          Q.   And when did you first see the dog?

9          A.   When it came towards me.

10          Q.   Where did the dog start its path towards

11   you?

12          A.   Like I said, from the open door inside the

13   apartment.

14          Q.   Well, right.  But the dog didn't start at

15   the open door, or you would have seen the dog right

16   when you looked to your left; correct?

17          A.   I don't know where the dog came from

18   inside the apartment.

19          Q.   That's what I'm asking.

20          A.   I don't know.

21          Q.   So how far away was the dog from you when

22   you first observed the dog?

23          A.   At my feet.

24          Q.   But you stated that the dog was charging

25   at you.  But now you're saying that you first saw the

Confidential

23

1          JOSEPH PERRONE - BY MR. ALBERT

2    dog when she was already at your feet?

3          A.  Correct.

4          Q.  So how does that -- so basically you're

5    saying that --

6          A.  Maybe a foot from my feet.

7          Q.  Okay.  So the dog charged for one foot is

8    what you're saying?

9          A.  Yeah.  The dog was coming quickly towards

10   me at my feet, yes.

11         Q.  But the question is when you first saw the

12   dog, how close was the dog to you when you first saw

13   the dog?

14         A.  The dog immediately appeared and was

15   traveling quickly towards me maybe a foot away.

16         Q.  So the dog charged for one foot; correct?

17         A.  Sure.

18         Q.  And it moved at a very quick rate of speed

19   for that one foot; that's your testimony?

20         A.  Sure.

21         Q.  Okay.  So did you make any verbal commands

22   to the dog in any way, shape or form?

23         A.  No.

24         Q.  What were you wearing on that date?

25         A.  Full duty uniform.



Confidential

24

```
 1              JOSEPH PERRONE - BY MR. ALBERT
 2         Q.   What weaponry were you armed with, for
 3    lack of a better term?
 4         A.   .45 caliber handgun.
 5         Q.   Did you have any pepper spray or anything
 6    like that?
 7         A.   Yes.
 8         Q.   Where was that?
 9         A.   On my belt.
10         Q.   The pepper spray was on your belt;
11    correct?
12         A.   Correct.
13         Q.   Anything else besides the gun and pepper
14    spray?
15         A.   I have a Taser.
16         Q.   Where was that?
17         A.   On my belt.
18         Q.   And even though the dog was at your
19    feet -- the dog didn't bite you, let's start there;
20    right?
21         A.   No.
22         Q.   And it didn't make a sound; correct?
23         A.   Correct.
24         Q.   And you had a gun, a Taser, as well as
25    pepper spray; correct?
```



Confidential

25

1           JOSEPH PERRONE - BY MR. ALBERT

2           A.   I had my gun in my hand.

3           Q.   Right.   The other two things were on your

4    belt; correct?

5           A.   Correct.

6           Q.   So what did you do upon seeing the dog,

7    quote-unquote, at your feet?

8           A.   I took a step backwards, realizing the dog

9    was continuing towards me, and I fired one round

10   downward towards the dog.

11          Q.   How long -- downward in a completely

12   downward trajectory?

13          A.   I wouldn't say completely downward.   I

14   would say from here angled downward (indicating).

15          Q.   How far away was the dog from you when you

16   shot the dog?

17          A.   Probably a foot, less than a foot.

18          Q.   And the dog was low to the ground; is that

19   accurate?

20          A.   That's accurate.

21          Q.   And if you could -- and we'll have to try

22   to put it into words, but could you show the

23   trajectory with which you discharged your firearm

24   towards the dog?

25          A.   How would that go on the record?

Confidential

26

1              JOSEPH PERRONE - BY MR. ALBERT

2         Q.   You'll maybe make a hand -- or you can try

3    to describe it, I guess.

4              MR. BEATH:   If you're able to describe the

5    angle that you were holding the gun at when you

6    discharged it, go for it.   If you can't, that's fine,

7    too.

8         A.   If I'm standing, it's a downward angle

9    like this (indicating).

10        Q.   So not straight down --

11        A.   Correct.

12        Q.   -- but at an angle.   Okay.

13             You did take a step back; correct?

14        A.   Yes.

15        Q.   To see what the dog would do; correct?

16        A.   Yes.

17        Q.   Why did you not try to deploy a nonlethal

18   form of force at that time?

19        A.   There was not enough reasonable time in

20   order to do that.

21        Q.   But there was enough reasonable time to

22   take a step backwards; correct?

23        A.   One step, yes.

24        Q.   But in that time you're unable to pull out

25   pepper spray?



Confidential

27

```
 1              JOSEPH PERRONE - BY MR. ALBERT
 2        A.   Correct.
 3        Q.   So you walk faster than you could pull
 4   something?
 5              MR. BEATH:  Objection.
 6              You can answer.
 7        A.   Yes.  Based on training and experience,
 8   yes.
 9        Q.   All right.  And obviously you had to point
10   your gun towards the dog; correct?
11        A.   Gun's already out, low ready position.  So
12   the gun's already there.
13        Q.   So you shot the dog; correct?
14        A.   Correct.
15        Q.   And did you know whether you made impact
16   or not?
17        A.   I -- I don't know at that time.
18        Q.   How many times did you pull the trigger,
19   if you know?
20        A.   Three.
21        Q.   When you shot the animal, you were still
22   in that vestibule area; correct?
23        A.   The first shot, yes.
24        Q.   Okay.  Then what about the second two?
25        A.   Second two I was running out onto the
```



Confidential

28

| | |
|---|---|
| 1 | JOSEPH PERRONE - BY MR. ALBERT |
| 2 | porch from the vestibule area as the dog continued to |
| 3 | follow me outside, and which I fired two more rounds. |
| 4 | Q.  So the second two shots the dog was |
| 5 | outside; correct? |
| 6 | A.  The dog was on the vestibule at the door |
| 7 | area leading to the outside. |
| 8 | Q.  Was he crossing the precipice to the |
| 9 | outside? |
| 10 | A.  I'm not sure. |
| 11 | Q.  But the dog was, I guess, in the front of |
| 12 | the house -- the front and center of the house; |
| 13 | correct? |
| 14 | A.  That's correct. |
| 15 | Q.  Either in the doorway or outside; correct? |
| 16 | A.  Correct. |
| 17 | MR. BEATH:  Objection. |
| 18 | You can answer. |
| 19 | Q.  Either in the doorway or outside; right? |
| 20 | A.  Correct. |
| 21 | Q.  And no other officers were present at that |
| 22 | point; correct? |
| 23 | A.  Correct. |
| 24 | Q.  Do you know a Stephen Dawley? |
| 25 | A.  Yes. |

Confidential

29

1          JOSEPH PERRONE - BY MR. ALBERT

2     Q.  Who is he?

3     A.  He was my supervisor at the time.

4     Q.  He wasn't present at the scene?

5     A.  Not during the incident, no.

6     Q.  When did he arrive?

7     A.  After I informed him that there was a dog

8  shot.

9     Q.  Did you do that over the radio?

10    A.  Yes.

11    Q.  Upon -- so you fired three shots; right?

12    A.  Yes.

13    Q.  Were they in close succession with one

14  another?

15    A.  There was one, and then there was two

16  more.

17    Q.  So how long after you fired the first shot

18  did you fire the second two shots?

19    A.  Maybe a few seconds.

20    Q.  A few seconds.  All right.  What happened

21  next?

22    A.  The dog continued to stay out on the porch

23  area.  I retreated all the way back to the sidewalk

24  street area.  At that point is when another officer

25  showed up.  And I informed him that there's a dog on



Confidential

1          JOSEPH PERRONE - BY MR. ALBERT

2     the front porch, and it's been shot.  And I put it

3     over the air that I've shot a dog.

4          Q.   Who was the other officer, if you recall?

5          A.   I believe it was Officer Johnson.

6          Q.   Did any other officers -- how long after

7     you shot the dog did Officer Johnson show up?

8          A.   Maybe a minute.

9          Q.   So how long from the time you arrived at

10    123 Trafalgar was it until a second officer showed up

11    on the scene?

12         A.   One minute.

13         Q.   One minute?  Okay.  So your testimony is

14    all this went down in one minute before another

15    officer showed up?

16         A.   According to the CAD system here that you

17    have a printout of, my on-scene time is 11:30, and the

18    second officer arriving on scene is 11:31.

19         Q.   You radioed in that the dog was shot

20    immediately after you shot the dog; correct?

21         A.   Correct.

22         Q.   When does the CAD indicate that you called

23    that in?

24         A.   11:31.

25         Q.   And what happened when Officer Johnson

Confidential

1          JOSEPH PERRONE - BY MR. ALBERT

2     showed up?

3          A.   I informed him of what happened.   I

4     informed him that there's a dog on the front porch

5     suffering from gunshot wounds.   We still had an open

6     door on the apartment that we still don't know what's

7     going on inside that apartment or if a crime has

8     occurred in that apartment.   And I requested

9     supervisor and technician down to the scene.

10          Q.   Then what happened?

11          A.   My supervisor showed up.   I informed him

12     of what happened, and I didn't have any other dealings

13     at the scene.

14          Q.   Well, what do you mean by that?   What did

15     you do after speaking to your supervisor?

16          A.   I informed him of what happened.   I

17     informed him of where this occurred, made sure that

18     the technician knew where to look for possible

19     evidence and my casings.   Basically it was treated as

20     an officer-involved shooting.

21               And I went to inspect my gun to make sure

22     there was no malfunction and to see how many rounds I

23     fired from it.

24          Q.   And your answer is three?

25          A.   Yes.

Confidential

32

1              JOSEPH PERRONE - BY MR. ALBERT
2         (The following exhibits were marked for
3         identification:  EXH Numbers 6 and 7.)
4         Q.  Did you fill out any paperwork, forms,
5    documents relating to your discharge of your firearm
6    on the date and time in question?
7         A.  No.
8         Q.  Why not?
9         A.  It's not a Rochester Police Department
10   policy.
11        Q.  What is their policy in regards to when an
12   officer shoots?
13        A.  When they shoot an animal, the supervisor
14   of that officer does the report.
15        Q.  Obviously the supervisor wasn't there when
16   you discharged your firearm; correct?
17        A.  Correct.
18        Q.  Obviously you know as a law enforcement
19   officer that hearsay information is generally not
20   reliable nor admissible; correct?
21             MR. BEATH:  Objection.
22             You can answer.
23        A.  In some cases, maybe.
24        Q.  Well, do you know -- and if you don't,
25   that's fine.  But do you know why the policy is to

Confidential

33

| 1 | JOSEPH PERRONE – BY MR. ALBERT |
| 2 | have the supervisor fill out the information as |
| 3 | opposed to the actual individual that was on scene |
| 4 | that lived it? |
| 5 | MR. BEATH:  Objection. |
| 6 | You can answer. |
| 7 | A.  I do not. |
| 8 | Q.  Okay.  Now, obviously, just to be clear, |
| 9 | you encountered the animal inside the house; correct? |
| 10 | A.  Inside the vestibule area. |
| 11 | Q.  Okay.  Which is inside the house; right? |
| 12 | Is the vestibule outside? |
| 13 | A.  No. |
| 14 | Q.  Is the vestibule inside? |
| 15 | A.  It's through a door, yes. |
| 16 | Q.  I mean, I know it's the hallway.  But if |
| 17 | we're talking inside or outside, it's inside; right? |
| 18 | A.  Okay. |
| 19 | Q.  Right?  Yes? |
| 20 | A.  It's through the outside door, yes. |
| 21 | Q.  Okay.  So the dog never ran out the front |
| 22 | door; correct? |
| 23 | MR. BEATH:  Form. |
| 24 | A.  The dog made it to the porch of the house |
| 25 | outside. |



Confidential

34

1          JOSEPH PERRONE - BY MR. ALBERT

2          Q.  I understand that the dog -- well, when

3    you say the dog made it to the front porch what do you

4    mean by that?

5          A.  When I retreated out to the sidewalk and

6    finally created enough distance and the dog as a

7    threat was done, the dog was on the porch of the house

8    outside of the home.

9          (The following exhibit was marked for

10          identification:  EXH Number 8.)

11          Q.  Showing you depo Exhibit 8.  Looking at

12    that, there's a top stairwell depicted in that

13    photograph; correct?

14          A.  Yes.

15          Q.  And there's also a big large spatter of

16    blood there; correct?

17          A.  Where are you talking?  There's a lot of

18    blood.

19          MR. BEATH:  Hold on one second.  I think

20    I'm getting a call from the court.

21          (There was a discussion off the record.)

22          (The proceeding recessed at 2:58 p.m.)

23          (The proceeding reconvened at 2:59 p.m.;

24          appearances as before noted.)

25    JOSEPH PERRONE, resumes;

Confidential

1          JOSEPH PERRONE - BY MR. ALBERT

2          CONTINUING EXAMINATION BY MR. ALBERT:

3          Q.  Well, while that's fresh in our minds, I

4   guess, why don't we go back to that original line of

5   questioning.  You had stated that you shot four

6   canines in your career.  Have you shot any other

7   entities, living entities, during that time frame?

8          A.  Are you asking while as a police officer

9   on duty?

10         Q.  Or otherwise.  Not including hunting

11   things.

12         A.  Yes.

13         Q.  Have you shot a human?

14         A.  Yes.

15         Q.  When?

16         A.  2009, January.

17         Q.  Was that while you were on duty?

18         A.  No.

19         Q.  Was that -- could you describe the

20   circumstances of that shooting?

21         A.  No.

22         Q.  Why not?

23              THE WITNESS:  Do I have to?

24              MR. BEATH:  No.

25              It was not on duty.  How is it relevant?



Confidential

36

1           JOSEPH PERRONE - BY MR. ALBERT
2           MR. ALBERT:  We can call back, but
3    clearly -- I don't know.  But this could easily lead
4    to relevant evidence.  I mean...
5           MR. BEATH:  It was an off-duty shooting.
6    I think the judge's instruction would encompass this.
7    I would ask that we mark this section of the
8    transcript as confidential.
9           MR. ALBERT:  Yeah, absolutely.
10          MR. BEATH:  To be shared only by counsel.
11   And if it becomes relevant, we're going to and we're
12   going to share it with the court, etcetera, then we
13   can discuss the means to do that.
14          MR. ALBERT:  Absolutely.
15          MR. BEATH:  So can we mark that in the
16   transcript that this section of the testimony is
17   confidential?
18       (There was a discussion off the record.)
19       (Pages 37 through 39, inclusive, have been
20       deemed "Confidential.")
21              *        *        *
22
23
24
25

Confidential

```
                         CONFIDENTIAL
 1              JOSEPH PERRONE - BY MR. ALBERT

 2          (Pages 37 through 39, inclusive, have been

 3          deemed "Confidential.")

 4                    *      *      *

 5          CONFIDENTIAL EXAMINATION BY MR. ALBERT:

 6              Q.   Describe the circumstances with which

 7     you -- did you kill someone in 2009?

 8              A.   Yes, I did.

 9              Q.   Describe those circumstances, please.

10              A.   I pulled up on a robbery in progress at a

11     location in the town of Greece.  I was observing the

12     robbery with two males with handguns.  I exited my

13     police car with my off-duty handgun, challenged both

14     males, refused to drop the gun, and I shot one.

15              Q.   And he died; correct?

16              A.   Correct.

17              Q.   Do you know whether that case -- did you

18     go before a Grand Jury on that case?

19              A.   I did.

20              Q.   Were you indicted?

21              A.   No.

22              Q.   It was no-billed?

23              A.   Yes.

24              Q.   Okay.  Did you face any disciplinary

25     action for that particular shooting?
```



Confidential

38

```
                           CONFIDENTIAL
  1                JOSEPH PERRONE - BY MR. ALBERT

  2        A.   No.

  3        Q.   Have you ever faced any -- when I say

  4   that -- I guess, let me rephrase that.

  5             Did your actions go before a disciplinary

  6   board?

  7        A.   It went to my internal affairs department,

  8   yes.

  9        Q.   And what was the internal affairs ruling,

 10   if you recall?

 11        A.   Justified.  Exonerated.

 12        Q.   Have any of your actions gone before the

 13   internal affairs review board in your career as a

 14   police officer?

 15             MR. BEATH:  Objection.

 16             MR. ALBERT:  She said that both lines of

 17   questioning, disciplinary records --

 18             MR. BEATH:  The only thing discussed with

 19   Kristin were firearms discharge, not disciplinary

 20   records more generally.  If we want to call and get

 21   another ruling -- the pitch that was made to Kristen

 22   was about the four dog shootings and your desire to

 23   inquire into any other shootings.

 24             If you're asking about discipline beyond

 25   any of that, then I renew my objection.
```

Confidential

```
                        CONFIDENTIAL
 1            JOSEPH PERRONE - BY MR. ALBERT

 2            MR. ALBERT:  I understand that you can

 3    object, and that's fine; but we're talking about

 4    depositions here.

 5            MR. BEATH:  I'm not going to allow it.

 6            MR. ALBERT:  I mean, we can call back --

 7    maybe for some clarification.  We should probably call

 8    back for some clarification.  Because my understanding

 9    was that she said both those questions should be

10    answered.

11            MR. BEATH:  Okay.

12        (The proceeding recessed at 3:03 p.m.)

13        (The proceeding reconvened at 3:08 p.m.;

14        appearances as before noted.)

15            MR. BEATH:  Are we still confidential?

16            MR. ALBERT:  No.  I'm done.

17            MR. BEATH:  You're done with that line of

18    questioning?

19            MR. ALBERT:  Yeah.  Yeah, I am.

20        (The proceeding returned to the nonconfidential

21        portion of the record.)

22                  *        *        *

23

24

25
```

Confidential

40

```
 1            JOSEPH PERRONE - BY MR. ALBERT
 2   JOSEPH PERRONE, resumes:
 3            CONTINUING EXAMINATION BY MR. ALBERT:
 4        Q.   I forget exactly where we were, but did
 5   the dog ever make it further than this front porch?
 6   Did the dog ever make it to any of the steps on its
 7   own?
 8        A.   I don't recall.  I remember seeing the dog
 9   on the porch right at the top of the steps there.
10        Q.   So this is where the dog was laying; is
11   that accurate (indicating)?
12        A.   Standing and laying, standing and laying,
13   yes.
14        Q.   The dog never ran out onto the porch;
15   correct?
16        A.   The dog continued to charge all the way
17   out onto the porch, yes.  I -- it chased me down the
18   stairs, but it stopped due to my firing of the weapon.
19        Q.   I see.  So you're saying you shot the dog
20   twice while the dog was right here (indicating)?
21        A.   No, I'm not saying that.  I'm saying from
22   the door inside to the stairs, to here (indicating),
23   between here and here (indicating), somewhere in there
24   was three gunshots towards the dog as I'm running down
25   the stairs.  That's what I'm saying.
```



Confidential

41

1          JOSEPH PERRONE - BY MR. ALBERT
2          Q.   That you fired shots while you were
3   running down the stairs?
4          A.   Correct.
5          Q.   Were you outside when you fired all three
6   of your shots?
7          A.   No.
8          Q.   How many shots did you fire while you were
9   outside?
10         A.   Two.
11         Q.   Okay.  You fired one shot inside and two
12  shots outside; correct?
13         A.   Best of my recollection, yes.
14         Q.   Because the dog was running outside at
15  you; correct?
16         A.   Correct.
17         Q.   Okay.  So the dog did run out the front
18  door; that's accurate?  Correct?
19         A.   To my recollection, yes.
20             MR. ALBERT:  Do you have a copy of this?
21             MR. BEATH:  That's the document we marked
22  as document 1 when Mr. Strong was here.  But I don't
23  know where that is.
24         (There was a discussion off the record.)
25         Q.   Let me just ask you this question.  So if



Confidential

42

1                    JOSEPH PERRONE - BY MR. ALBERT

2    someone were to say that you back stepped onto the

3    porch and fired three rounds, they would be mistaken,

4    because you shot one of the rounds inside the house;

5    correct?

6            A.  Say that again.

7            Q.  If someone were to have said that you back

8    stepped onto the porch and then fired three rounds,

9    they would be mistaken; correct?

10           A.  I believe my first round was made upon the

11   dog coming towards me, and then I turned to run and

12   fired two more shots.  That's the best of my

13   recollection.

14           Q.  So then Officer Johnson shows up; right?

15           A.  I believe, yes.

16           Q.  And then Dawley shows up; correct?

17           A.  I notified Sergeant Dawley.  I'm not sure

18   when he arrived on, scene.

19           Q.  Anyone else that you recall -- anyone else

20   show up on scene officer-wise?

21           A.  According to this, Officer Johnston,

22   Officer Johnson, Officer Hopwood, Officer Brown, and

23   that's what's on the CAD here.

24           Q.  So a lot of officers showed up; correct?

25           A.  A few, yes.



ALLIANCE
COURT REPORTING, INC.

*Video Conferencing and Videography Center*

585.546.4920      ▪      www.alliancecourtreporting.net      ▪      800.724.0836

Confidential

```
1                JOSEPH PERRONE - BY MR. ALBERT
2          Q.   And what you did at that point was merely
3     speak to Officer Dawley and then leave; is that
4     accurate?
5          A.   I spoke to sergeant Dawley.
6          Q.   Sergeant Dawley, excuse me.
7          A.   And I spoke to Officer Johnson.  And I
8     stood by the scene away from the scene by my police
9     car for a short period of time, and then I did leave,
10    yes.
11         Q.   So you didn't interact with Joseph Strong
12    at any point; correct?
13         A.   No.
14         Q.   You didn't interact, in fact, with any
15    civilians on scene; correct?
16         A.   I did not, no.
17         Q.   Did you see any police officers
18    interacting with any civilians on scene?
19         A.   I don't recall seeing that, no.
20         MR. ALBERT:   I'm not trying to be morbid.
21         (The following exhibits were marked for
22         identification:  EXH Numbers 9 and 10.)
23         Q.   Okay, I'm not trying to be morbid.
24    There's a legal reason why I have to do this.
25              Showing you depo 9 and 10, this is the
```



Confidential

44

1              JOSEPH PERRONE - BY MR. ALBERT

2    animal in question that you saw charge at you and that

3    you shot and killed on the date in question in January

4    of 2015?

5              A.   Yes.

6              Q.   And these depict the gunshot wounds that

7    she sustained; correct?

8              A.   It's a photo of the dog, yes.

9              Q.   And she was directly in front of you for

10   all three shots that you fired?

11             A.   The first one was in front of me at my

12   feet, the second as I was running.  My shots were

13   fired kind of like this as I'm running (indicating).

14   So I'm not sure exactly if the dog was head on, turned

15   or what.  I just know it was coming towards me.

16             Q.   And that's when you were outside running

17   on the stairs, and she was outside; correct?

18             A.   Correct.

19             MR. BEATH:  And for the record, you just

20   gestured with your right arm extended and with your

21   body turned away from your arm and that you were

22   shooting with that right arm?

23             THE WITNESS:  That's correct.

24             MR. ALBERT:  Okay.  I have no further

25   questions.



Confidential

45

```
1              JOSEPH PERRONE - BY MR. BEATH
2          MR. BEATH:  I just have a few questions.
3        EXAMINATION BY MR. BEATH:
4          Q.  So this is Exhibit 8.  Exhibit 8 shows the
5    porch area of 123 Trafalgar; is that right?
6          A.  Yes.
7          Q.  And that's how you recall it appearing
8    after this incident?
9          A.  After the incident, yes.
10         Q.  And you'll notice on the bottom left-hand
11   side of the entrance door does it look like there's
12   blood spatter there?
13         A.  On the siding here where the door is?
14         Q.  That's correct.
15         A.  Yes.
16         Q.  And does that have any -- seeing that
17   spatter there, does that have any meaning to you in
18   any fashion?
19         A.  Yes, it does.
20         Q.  What does it mean?
21         A.  It means that one of my rounds struck the
22   dog there, thus causing the splatter from the animal
23   projecting it onto the siding and the door.
24         Q.  And is that consistent with your
25   recollection of where the dog was as you fired at it?
```



Confidential

1               JOSEPH PERRONE - BY MR. BEATH

2       A.  Yes.

3       Q.  You have described during the course of

4  this deposition in detail about your ascending up onto

5  the porch, going through that doorway, encountering

6  the dog, discharging your firearm and fleeing off the

7  porch.  And you've broken that down into small moments

8  of time.

9          Did this incident happen like that, kind

10  of like a small bit and then a pause and then a small

11  bit and a pause and a small bit and a pause?

12          MR. ALBERT:  I'm going to object as to --

13  I have no idea -- that's vague.

14          MR. BEATH:  Okay.  Your objection is on

15  the record.

16       A.  No, it did not occur like that.

17       Q.  You said before -- looking at the

18  communications printout, it appears that between the

19  time that you got on the scene and when you went over

20  saying that there was a dog shot, how much time

21  passed?

22       A.  One minute.

23       Q.  And so what you've described from when you

24  got on the scene until the dog was shot, was that a

25  fluid ongoing situation?

Confidential

47

1             JOSEPH PERRONE - BY MR. BEATH

2        A.   Yes.

3        Q.   You said previously that the first shot --

4    when you first discharged your firearm, your gun was

5    pointed at a downward angle towards the dog, and the

6    dog was about a foot away from you at that time?

7        A.   Yes.

8        Q.   Do you know where that first bullet struck

9    the dog?

10       A.   I believe right in the facial area of the

11   dog.

12            MR. BEATH:   Okay.  I don't have anything

13   else.

14            MR. ALBERT:   Me either.

15                 (TIME: 3:20 p.m.)

16                  *       *       *

17

18

19

20

21

22

23

24

25

Confidential

48

```
 1
 2                    W I T N E S S
 3    Name           Examination by              Page
 4    ----------------------------------------------------
 5    Joseph Perrone        Mr. Albert            4-36
 6        "       "         Confidential         37-39
 7        "       "         Mr. Albert           40-44
 8        "       "         Mr. Beath            45-47
 9
                      *       *       *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential

```
 1
 2                    E X H I B I T S
 3   Exhibit        Description           Marked ID'ed
 4   -----------------------------------------------------
 5   EXH 4    Three pages of dispatch records   14      14
 6   EXH 5    Color photocopy of a photograph   16      16
 7   EXH 6    Rochester Police Department
              Animal Services Report            32
 8
     EXH 7    Rochester Police Department
 9            Incident Report, dated 1/16/15    32
10   EXH 8    Color photocopy of a photograph   34      34
11   EXH 9    Color photocopy of a photograph   43      43
12   EXH 10   Color photocopy of a photograph   43      43
13
                         *       *       *
14
15
16
17              EXHIBITS PREVIOUSLY MARKED
18   Exhibit        Description                   Page
19   -----------------------------------------------------
20   EXH
21        (No Previously Marked Exhibits Presented)
                         *       *       *
22
23
24
25
```



ALLIANCE
COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920      ▪      www.alliancecourtreporting.net      ▪      800.724.0836

Confidential

```
 1
 2              D O C U M E N T    R E Q U E S T S
 3    Request                                        Page
 4    -------------------------------------------------------
 5      Any and all documentation, including
        discharge firearm forms, relating to four
 6      dog shootings (Mr. Albert)                    10
 7
                         *        *        *
 8
 9
10
11
12
13
14              C E R T I F I E D    Q U E S T I O N S
15    Question                                       Page
16    -------------------------------------------------------
17
18                  (No Certified Questions)
                      *        *        *
19
20
21
22
23
24
25
```

Confidential

51

```
 1
 2              A C K N O W L E D G M E N T
 3         I, Joseph Perrone, declare, swear and aver
 4    that I have read my testimony contained herein and
 5    that my answers are true and correct, with any
 6    exceptions noted on the errata sheet, under penalty of
 7    perjury.
 8              _____
 9              Joseph Perrone
10
11
12         I certify that this transcript was signed
13    in my presence by Joseph Perrone on the _____ day of
14    _____, 2018.
15
16         IN WITNESS WHEREOF, I have hereunto set my
17    hand and affixed my seal of office of Rochester, New
18    York on this _____ day of _____, 2018.
19
20              _____
21              Notary Public
22
23              _____
24              My Commission Expires:
25
```



Confidential

52

1

2               E R R A T A   S H E E T

3           Witness: Joseph Perrone
         Deposition Date:  July 19, 2018
4    Pg #   Line #   Change            Clarification

5    _____  _____   _____  _____

6    _____  _____   _____  _____

7    _____  _____   _____  _____

8    _____  _____   _____  _____

9    _____  _____   _____  _____

10   _____  _____   _____  _____

11   _____  _____   _____  _____

12   _____  _____   _____  _____

13   _____  _____   _____  _____

14   _____  _____   _____  _____

15   _____  _____   _____  _____

16   _____  _____   _____  _____

17   _____  _____   _____  _____

18   _____  _____   _____  _____

19   _____  _____   _____  _____

20   _____  _____   _____  _____

21   _____  _____   _____  _____

22   _____  _____   _____  _____

23   _____  _____   _____  _____

24   _____  _____   _____  _____

25   _____  _____   _____  _____



ALLIANCE
COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920    ▪    www.alliancecourtreporting.net    ▪    800.724.0836

Confidential

53

1

2                        C E R T I F I C A T I O N

3

STATE OF NEW YORK:
4    COUNTY OF MONROE:

5              I, MICHELLE M. ROCHA, do hereby certify

6    that the foregoing testimony was duly sworn to; that I

7    reported in machine shorthand the foregoing pages of

8    the above-styled cause, and that they were produced by

9    computer-aided transcription (CAT) under my personal

10   supervision and constitute a true and accurate record

11   of the testimony in this proceeding;

12             I further certify that the witness

13   requests to review the transcript;

14             I further certify that I am not an

15   attorney or counsel of any parties, nor a relative or

16   employee of any attorney or counsel connected with the

17   action, nor financially interested in the action;

18             WITNESS my hand in the City of Rochester,

19   County of Monroe, State of New York.

20

21

     MICHELLE M. ROCHA

24   Freelance Court Reporter and

     Notary Public No. 01R05038965

25   in and for Monroe County, New York



**ALLIANCE**
COURT REPORTING, INC.
*Video Conferencing and Videography Center*
585.546.4920    ▪    www.alliancecourtreporting.net    ▪    800.724.0836