UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSEPH STRONG,

                              Plaintiff,

v.

                         Case # 17-CV-6183-FPG

                         DECISION AND ORDER

JOSEPH PERRONE,

                              Defendant.

## INTRODUCTION

Plaintiff Joseph Strong asserts a claim against Defendant Joseph Perrone for violating his Fourth Amendment right to be free from unreasonable seizures. ECF No. 1. Now before the Court is Perrone's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 23. For the following reasons, Perrone's motion for summary judgment is DENIED.

## BACKGROUND[1]

On a cold, snowy, and windy day in January, Perrone was dispatched to a house located in Rochester, New York. ECF No. 23-1 ¶¶ 1, 8, 11–12; ECF No. 29 ¶ 8. Perrone was responding to a neighbor's 911 call. ECF No. 23-1 ¶¶ 10–11. The neighbor reported that a door to the house was open. ECF No. 23-1 ¶ 10; ECF No. 29 ¶ 10.

Strong lived on the first floor of the the house with three dogs, which were typically permitted to roam the house when Strong was not home. ECF No. 23-1 ¶¶ 1, 3, 7. One of the dogs living in the house was "Sheba," a "pitbull." *Id.* ¶ 3. Sheba weighed between forty and fifty pounds,

---

[1] Unless otherwise stated, the following facts are taken from the record and are construed in a light most favorable to Plaintiff. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor.").

1

was friendly, and was never aggressive with people or animals. ECF No. 29 ¶ 4. Sheba never bared her teeth toward visitors to the house. *Id.*

The house entrance is apparently comprised of two doors located on a porch. ECF No. 23-1 ¶ 29. Inside that entrance, there is a small vestibule with an open entryway to Strong's living room. *Id.* ¶ 16. Earlier that morning, Strong left his home for work. *Id.* ¶ 5. The wind blew at least one of the entrance doors open after Strong left. *Id.* ¶ 9; ECF No. 29 ¶ 9.

Perrone arrived at Strong's home with several other officers. ECF No. 23-1 ¶¶ 11, 12; ECF No. 29 ¶¶ 11, 12. Perrone saw that at least one door was open and approached the entrance. ECF No. 23-1 ¶ 13; ECF No. 29 ¶ 13. Perrone claims that he stepped inside the vestibule, drew his firearm, announced his presence, and saw Sheba charge him from inside the house. ECF No. 23-1 ¶¶ 13, 17–19. Perrone claims that the dog bared its teeth and moved very quickly, coming within a foot of Perrone. *Id.* ¶ 20. Perrone attempted to take a step back, but the dog continued to advance, forcing Perrone to shoot the dog once. *Id.* ¶ 21. After the first shot, Perrone retreated on to the porch, firing twice more at the dog as it continued to advance through the vestibule towards Perrone. *Id.* ¶ 23.

Although he was not home during the encounter, Strong claims that Perrone opened a screen door, did not announce his presence, and did not step inside the vestibule, but instead was merely standing next to the vestibule door when he shot Sheba. ECF No. 29 ¶¶ 13, 17, 21. Strong argues that Perrone first saw Sheba when she was already at Perrone's feet and that, because of her close proximity, Perorne could not have seen Sheba charge or bare her teeth. *Id.* ¶¶ 19, 20. Strong further claims that Perrone shot Sheba on sight rather than attempting to retreat or to close the vestibule door. *Id.* ¶¶ 21, 22.

The parties do not dispute that the entire incident happened quickly. ECF No. 23-1 ¶ 27; ECF No. 29 ¶ 27. Sheba did not bark or growl during the fateful encounter and approached Perrone "low to the ground." *Id.* ¶ 20; ECF No. 29 ¶ 20.

At the time of the shooting, Hank Randolph was living in the attic of the house. ECF No. 23-1 ¶¶ 2, 30. Randolph heard the gunfire, came downstairs, and called Strong to tell him that Sheba had been shot. *Id.* ¶¶ 30–33. Strong then spoke with an animal control officer who informed Strong that Sheba was in extreme pain and that he did not think she would survive. *Id.* ¶ 34; ECF No. 29 ¶ 34. Strong gave his permission for Sheba to be euthanized. ECF No. 29 ¶ 34.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## DISCUSSION

### I. Unlawful Seizure

"[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). The parties here dispute whether the killing of Sheba was

3

unreasonable. Strong bears the burden of demonstrating unreasonableness. *Id.* The Court must "analyze this question from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 757 (2014) (quotations and alteration omitted).

"To determine whether a seizure is unreasonable, a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion' and determine whether 'the totality of the circumstances justified the particular sort of seizure.'" *Carroll*, 712 F.3d at 651 (alterations omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). The Court is mindful that "ensuring officer safety" is a "particularly significant governmental interest[]." *Id.* Conversely, the shooting of Strong's "dog was a severe intrusion given the emotional attachment between a dog and an owner." *Id.* As the Fourth Circuit has explained, "private interests in dogs—and family pets especially—are highly significant since dogs have aptly been labeled 'Man's Best Friend,' and certainly the bond between a dog owner and his pet can be strong and enduring." *Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020) (quotation omitted). "[W]hen a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable . . . ." *Matteson v. Hall*, No. 18-CV-6772, 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019) (quotation omitted) (collecting cases).

The question here is whether a reasonable jury could find that Perrone behaved unreasonably in shooting Sheba in Strong's home. A reasonable jury could find Perrone's conduct

4

unreasonable based on the context in which Sheba was shot, Sheba's behavior, and Perrone's opportunity to employ non-lethal alternatives.

A. Context

Strong argues that Perrone's unlawful entry in to his residence renders his seizure of Sheba unlawful.[2] ECF No. 28 at 4–9. The Supreme Court has held that a separate Fourth Amendment violation may not be used "to manufacture a[ seizure] claim where one would not otherwise exist." *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (rejecting Ninth Circuit's "provocation rule," which "instruct[ed] the court to ask whether the law enforcement officer violated the Fourth Amendment in some other way in the course of events leading up to the seizure"). "[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Id.* at 1547. In other words, the reasonableness of Perrone's allegedly unlawful "search" may not be considered when evaluating the reasonableness of Perrone's allegedly unlawful "seizure." *See Williams v. Voss*, No. 10-CV-2092, 2011 WL 4340851, at *5 (D. Minn. Sept. 15, 2011) (rejecting argument that failure to knock and announce should be considered in calculus of reasonableness of seizing a dog).

The Court's finding that the reasonableness of the search is not determinative of the reasonableness of the seizure does not, however, blind the Court to the broader context of Perrone's presence in Strong's home. *See, e.g.*, *Cabisca v. City of Rochester*, No. 14-CV-6485, 2019 WL 5691897, at *11 (W.D.N.Y. Nov. 4, 2019) (examining reason for police officer's presence in

---

[2] Although Strong originally alleged an unlawful entry claim, Strong did not actually allege that Perrone entered his home. ECF No. 11 at 7–8. Because there was no entry alleged, the Court dismissed Strong's unlawful entry claim. *Id.* at 8. It is now undisputed that Perrone at least stood in the entrance to Strong's home, ECF No. 23-1 ¶ 17; ECF No. 29 ¶ 17, but Strong has not sought leave to amend his complaint to reassert an unlawful entry claim. Accordingly, the Court expresses no opinion on whether standing in a home's entrance constitutes an entry, on the reasonableness of any entry, or on whether the entry was a proximate cause of Sheba's death. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1548 (2017) (noting that "[t]he harm proximately caused by" two Fourth Amendment violations "may overlap").

evaluating totality of the circumstances). Perrone encountered Sheba in Strong's home, not running free in public. Accordingly, the government's interest in protecting the public from loose dogs is inapplicable and Strong's interest in retaining ownership of Sheba is correspondingly stronger. *See Altman v. City of High Point*, 330 F.3d 194, 207 (4th Cir. 2003); *Azurdia v. City of New York*, No. 18-CV-4189, 2019 WL 1406647, at *7 (E.D.N.Y. Mar. 28, 2019) ("[T]he fact that Lola was shot inside plaintiffs' apartment . . . weighs in favor of a finding that the seizure here impermissibly interfered with plaintiffs' strong Fourth Amendment interests in Lola's protection."). The context of the situation accordingly weighs in favor of finding the seizure of Sheba unreasonable.

      B.      *Sheba's Behavior*

Sheba's behavior is also relevant to the Court's analysis. If a dog is showing signs of aggression (baring teeth, ears back, tail straight, lunging, growling, snarling, barking, or charging), courts regularly find that it is reasonable for officers to defend themselves. *See Carroll*, 712 F.3d at 650, 652 (finding lethal force could be reasonable where dog was growling, barking, and quickly approaching police officer); *Grant v. City of Houston*, 625 F. App'x 670, 677–78 (5th Cir. 2015) (finding lethal force reasonably used where dog was biting at police officers legs and aggressively barking); *Kendall v. Olsen*, 237 F. Supp. 3d 1156, 1169 (D. Utah Feb. 17, 2017) (finding lethal force reasonably used where dog charged police officer and lunged with ears back and a straight tail while barking loudly, snarling, and baring its teeth). Conversely, "[t]he mere presence of a dog inside of a[ home]—absent any actions that could reasonably be considered dangerous—does not

justify a seizure." *Azurdia*, 2019 WL 1406647, at *7 (collecting cases). A dog approaching an officer, without some sign of aggression, is also insufficient. *See id.* at *8.

Sheba did not bark, growl, or make any noise. ECF No. 23-5 at 13. Perrone claims that Sheba charged him, moved very quickly and low to the ground, and bared her teeth. ECF No. 23-1 ¶¶ 19, 20. He argues that, as the only direct witness to the dog's behavior in the moments before he shot Sheba, his testimony thereto is uncontradicted. ECF No. 31. Conversely, Strong alleges that there is a material factual dispute regarding Sheba's behavior because Perrone's account of the events should not be credited and circumstantial evidence points to a contrary conclusion. ECF No. 34 at 2–4. The Court agrees that there is enough direct and circumstantial evidence that a reasonable jury could find that Sheba was not displaying signs of aggression.

As the only direct witness of Sheba's behavior in the moments before he shot her, Perrone's credibility is very important. Courts may not make credibility determinations in ruling on a motion for summary judgment. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). "If the credibility of the movant's witness is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied." *Sterling Nat'l Bank & Tr. Co. of N.Y. v. Federated Dep't Stores, Inc.*, 612 F. Supp. 144, 146 (S.D.N.Y. 1985). "There must, however, be more than mere allegations in a memorandum of law to place credibility in issue and preclude summary judgment; specific facts must be produced." *Id.*

Perrone argues that Strong has only made conclusory attacks on his credibility without pointing to specific facts in the record. ECF No. 31 at 3–4. But Strong has pointed to specific facts that raise doubts about Perrone's account of the critical moments leading up to his shooting of Sheba and lend credence to Strong's theory of the relevant events.

7

Perrone maintains that both doors to the house were open, but Strong's neighbor, Kathy King, testified that one of the doors was shut.[3] ECF No. 31 at 7–8; ECF No. 30-6 at 25–26, 32. Perrone also claims that he entered the vestibule area in the house, drew his weapon, announced his presence, and then saw Sheba moving quickly towards him from within Strong's home baring her teeth. ECF No. 23-5 at 9–14. Perrone, however, also confusingly testified that he first saw Sheba when she was already at his feet or within a foot of his feet, *id.* at 14–15, which would make it difficult for him to observe her baring her teeth—particularly given that he also testified she was moving low to the ground, *id.* at 15, 17. Whether Sheba bared her teeth (and whether Perrone had an opportunity to observe such an act) is critically important in this case because the other alleged signs of aggression are relatively benign.[4]

Further, there is evidence suggesting that Perrone did not, as he maintains, enter the house. A Rochester Police Department Incident Report states that he did not enter the house. ECF No. 30-7. King also testified that Perrone did not enter the house, but instead opened the screen door and immediately started shooting. ECF No. 30-6 at 26, 33–34. Other evidence suggests that Perrone did not announce his presence. Specifically, Randolph testified that, although he was in the attic and could normally hear people talking loudly downstairs, he did not hear Perrone announce his presence. ECF No. 30-5 at 32–33. The speed with which the situation developed also suggests that Perrone may not have had time to enter the house or announce his presence—he was

---

[3] Perrone claims that it is undisputed that both doors were open because Strong testified that both doors were open, ECF No. 31 at 7–8, but Strong made clear that he was not there and was simply testifying to "what [he] heard." ECF No. 23-4 at 34–35. Given King's testimony to the contrary, this fact is in dispute.

[4] Sheba did not bark or growl. ECF No. 29 ¶ 20. Perrone merely alleges that Sheba moved towards him quickly and low to the ground. ECF No. 23-1 ¶ 20. Perrone has not presented evidence that a dog approaching someone "low to the ground" is a sign of aggression, rather than a sign of submission. And a dog's approach, without some other sign of aggression, is insufficient to justify lethal force. *Azurdia*, 2019 WL 1406647, at *8. Accordingly, for purposes of his motion, Perrone's actions are supported solely by the allegations that Sheba moved quickly and bared her teeth.

on the scene for a minute total before reporting the shooting over his radio. ECF No. 23-1 ¶ 27. A jury must examine these discrepancies regarding the critical moments leading up to Perrone's shooting of Sheba and weigh the relative credibility of the witnesses. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

Sheba's general temperament is also relevant. *Matteson*, 2019 WL 2192502, at *8 (finding that dog may not have been displaying signs of aggression because dog "had never displayed aggressive behavior toward anyone and, the day before, had greeted a visitor to the residence in an appropriate manner"); *Robinson v. Pezzat*, 818 F.3d 1, 10–11 (D.C. Cir. 2016) (noting that the district court relied on dog's history of aggression in discrediting plaintiff's testimony that the dog was not behaving aggressively but holding that granting summary judgment against plaintiff on that basis was improper). Other courts have denied summary judgment in dog shooting cases based on circumstantial evidence. *Thurston v. City of N. Las Vegas Police Dep't*, 552 F. App'x 640, 642 (9th Cir. 2014) (finding that a "jury could infer" that dogs did not attack based on indirect evidence presented by plaintiff contradicting testimony of police officers that dogs attacked); *see also Knox v. County of Putnam*, No. 10-CV-1671, 2012 WL 4462011, at *5–6 (S.D.N.Y. Sept. 27, 2012) (holding that summary judgment was precluded based on circumstantial evidence that discredited deputy sheriff's account). There is an abundance of testimony that Sheba was well behaved and non-aggressive. ECF No. 30-5 at 26–28; ECF No. 30-6 at 29, 32. This evidence supports Strong's argument that Sheba did not behave aggressively when she encountered Perrone.

In sum, a reasonable jury could conclude that Perrone is mischaracterizing his interaction with Sheba and that she was not showing signs of aggression. Such a conclusion would weigh strongly in favor of finding that Perrone acted unreasonably.

### C. Non-Lethal Alternatives

Finally, there is a factual dispute regarding the availability of a non-lethal alternative. Strong argues that Perrone could have simply shut the door to the house before shooting Sheba. ECF No. 28 at 11. Perrone argues that shutting the door was not an option because the door may have been compromised given that it was open and the situation developed very rapidly. ECF No. 31 at 8. As discussed above, there is a dispute as to whether Perrone opened the screen door and whether he entered the house or was standing in the entrance. Perrone has not cited evidence of his belief that the door was too compromised to contain Sheba; he has only made such a conclusory argument in his brief. Such a conclusory argument is undermined by the evidence in the record that one of the doors was closed. Further, other courts have rejected similar arguments. In *Ray*, the Fourth Circuit overturned the lower court's conclusion that an officer did not behave unreasonably in shooting a dog where the lower court found that "a lead . . . might or might not have [been] trusted to hold" a large, barking dog. *Ray v. Roane*, No. 17-CV-93, 2018 WL 4515893, at *5 (W.D. Va. Sept. 20, 2018), *rev'd*, 948 F.3d 222 (4th Cir. 2020); *see also Bullman v. City of Detroit*, 787 F. App'x 290, 293, 300 (6th Cir. 2019) (finding that dogs could not be considered imminent threat as a matter of law because, among other reasons, dogs were separated from police officers by a wooden barricade that officer believed dogs were "easily" capable of escaping).

Although the speed at which the situation developed supports Perrone's theory that he had no time to take any other action, *Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."), a reasonable jury could also find that the quickly developing situation supports Strong's theory that Perrone did not have time to enter the

house and was thus standing in the doorway with a ready opportunity to close one of the doors.[5] A readily available, non-lethal method of stopping Sheba's advance could render Perrone's conduct unreasonable. *See Carroll*, 712 F.3d at 650–51 (discussing non-lethal options); *Ray*, 948 F.3d at 228 (finding that, if dog's leash made it obvious that it could not reach police officer, police officer "could not have held a reasonable belief that the dog posed an imminent threat"). Perrone being startled by Sheba's presence does not provide him with carte blanch. A reasonable jury could conclude, based on the direct and circumstantial evidence presented, that Perrone hastily and unnecessarily shot a dog that was not showing signs of aggression.

Ultimately, both Perrone and Sheba may have behaved reasonably under the circumstances. *See Cabisca*, 2019 WL 5691897, at *11. At this stage, however, factual disputes preclude such a finding.

## II. Qualified Immunity

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). "Because qualified immunity is an immunity from suit rather than a mere defense to liability it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (quotation and alteration omitted). "Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).

---

[5] Perrone cites the Fourth Circuit's decision in *Altman* for the proposition that an officer is not required to attempt to use potentially ineffective nonlethal force. 330 F.3d at 207. As discussed above, *Altman* turned partially on the context of the situation. The dogs there were "running at large" and the court emphasized the public interest in controlling a dog on the loose. *Id.* Further, the chance of successfully stepping back and shutting a door to stop the advance of a dog in her owner's home seems stronger than employing one of the array of nonlethal options discussed in *Altman* (traps, catch poles, stun batons, or tranquilizer guns) to stop a dog marauding around an open area. *Id.* at 218 (Gregory J., Dissenting in Part).

Qualified immunity will shield an officer from liability for damages if his "conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotation omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* There need not be "a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the . . . constitutional question beyond debate." Stanton v. Sims, 571 U.S. 3, 6 (2013) (quotation omitted).

In this case, the Court has already determined that a reasonable jury could find that Perrone violated Strong's constitutional right to be free from unreasonable seizures. It is further clearly established that killing "a pet without justification constitutes a Fourth Amendment violation." *Azurdia*, 2019 WL 1406647, at *8; *see also Ray*, 948 F.3d at 229–30 (finding that, although there was no "directly on-point, binding authority" in the Fourth Circuit, the principle "that it is unreasonable for a police officer to shoot a privately owned animal when it does not pose an immediate threat to the officer or others" was clearly established by the general principles espoused in prior Fourth Circuit opinions and the consensus of the other circuits). Accordingly, qualified immunity turns on whether Perrone had justification to kill Sheba.

Perrone cites two dog shooting cases in which courts found that officers were entitled to qualified immunity, but in both cases, it was undisputed that the dogs in question were showing signs of aggression. *Stephenson v. McClelland.* 632 F. App'x 177, 184–85 (5th Cir. 2015) (bared teeth); *Lane v. Rechtfertig*, No. 16-CV-473, 2017 WL 5653870, at *4 (W.D. Tex. Jan. 25, 2017)

12

(growled and barked in an aggressive posture). As discussed above, there is a genuine factual dispute as to whether Sheba was showing any signs of aggression in this case. No reasonable officer could conclude that it is constitutionally permissible to shoot a dog in its owner's home if the dog was not showing signs of aggression and the officer had the opportunity to retreat. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211–12 (3d Cir. 2001) (holding that an officer would not be entitled to qualified immunity if it was shown that he shot a dog that posed no immediate danger).[6] Accordingly, Perrone is not entitled to summary judgment based on qualified immunity.

## CONCLUSION

Perrone's motion for summary judgment, ECF No. 23, is DENIED. This matter is set for a status conference on May 26, 2020 at 2:00 p.m.

IT IS SO ORDERED.

Dated: March 25, 2020
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[6] Because the Court finds that Perrone's motion fails without need to reference information supplied by Strong's expert witness, the Court expresses no opinion regarding that information's appropriate weight.